**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

The United States of America

        Plaintiff,

    v.

The State of Ohio and
Buckingham Coal Company,

        Defendants.

Case No. 2:11-cv-383

Judge Graham

Order Denying the United States of America's
Application for a Temporary Restraining Order

This matter is before the court on the application of plaintiff United States of America for an order under Rule 65(b) of the Federal Rules of Civil Procedure temporarily restraining defendant Buckingham Coal Company from performing mining activities underneath the East Branch of Sunday Creek in Burr Oak State Park. The United States Army Corps of Engineers operates the Tom Jenkins Dam and Burr Oak Reservoir in Athens and Morgan Counties in Ohio, and it owns a flowage easement for the land under which Buckingham intends to mine. The United States argues that mining activities would compromise its ability to operate the dam for flood control purposes.

The parties have fully briefed the motion and have submitted evidentiary materials. The court held an initial conference with the parties on May 10, 2011 and held an evidentiary hearing on May 11, 2011 in which the parties tendered the testimony of fact witnesses and experts in mining-related fields.

For the reasons that follow, the United States' motion is DENIED.

I.    **Factual Findings**

The Tom Jenkins Dam is a "rolled earth" fill dam, with a top length of 944 feet and a maximum height of 84 feet. U.S. Ex. 4. The top of the dam is located at an elevation of 765 feet above mean sea level ("m.s.l."). The reservoir pool is normally maintained at 721 m.s.l. The Corps could draw down the level to 710 m.s.l for water supply purposes. The reservoir design includes an uncontrolled spillway

at 740 m.s.l.  The record elevation of the reservoir pool occurred in 1968 at 731.5 m.s.l.  See Decl. of Richard Allwes, ¶6.

The Flood Control Act of 1944 authorizes the construction of certain public works for flood control purposes.  P.L. 78-534.  The Act contemplated that the Corps would undertake such projects in cooperation with the States in which the projects would be built.  The Corps identified the Sunday Creek as the location for a project relating to flood control for the Ohio River Basin.  In 1947, the Corps prepared a Definite Project Report for the Tom Jenkins Dam and Burr Oak Reservoir (together the "Project").  In 1948, the Corps entered into an agreement with the State of Ohio regarding the parties' respective obligations as to funding, land acquisition, construction, and land use.  The Agreement required the Corps to construct and maintain the Project using federal and state funds.  It required Ohio to commit certain funds for the Project, to pay annual operating costs, and to acquire all interests (including mineral rights) in lands within the Project.  The Agreement further required Ohio to convey to the United States a flowage easement upon the lands acquired, up to elevation 750 m.s.l. "as required by the [United States] Government for flood control, erosion and water supply purposes, as set forth in the land acquisition program to be agreed upon . . . ."  1948 Agreement, Art. I, §5.  The Agreement further prevented "the location and/or maintenance of any future encroachments, structures or obstructions therein which, in the opinion of the [Army Corps] District Engineer, reduces or tends to reduce the flood carrying capacity of said Branch and Channel . . . ."  Id., Art. I, §8.

The parties shortly thereafter executed a Real Estate Planning Report, which the United States contends was the "land acquisition program" called for in §5 of the Agreement.  The Report required Ohio to "acquire and retain title to all lands, or interests in land, in the reservoir area, conveying, however, to the United States . . . a perpetual [flowage] easement."  Report at 3.  The Report also stated that "[i]n addition to acquisition of lands as outlined above, it is estimated that it will be necessary for the State to acquire the coal, oil and gas [interests], and to extinguish outstanding rights thereto, in the lands (approximately 1,450 acres) underlying elevation 750 [m.s.l.]"  Id. at 6.  The Report further provided that "it is considered that, since operation of the reservoir will prevent future mining, it will be necessary for the State to acquire the coal underlying the lands below elevation 740 [m.s.l.], the

2

spillway crest level . . . . [A]nd it is considered desirable that mining operations be prohibited within or upon the entire easement area." Id. at 7.

Invoking a provision of the Agreement that allowed the United States to acquire land if the progress of Ohio's land acquisition went too slowly, the Corps condemned the coal interests in the particular tracts of land under which Buckingham proposes to mine. In 1962, the United States deeded those condemned coal interests (as well as land interests in other tracts) to Ohio "in compliance with and furtherance of the provisions" of the 1948 Agreement. 1962 Deed at 1. This deed did not contain any prohibitions or restraints on the alienation of coal rights.

In 1963, Ohio deeded to the United States a "perpetual easement and right to flood" all Project lands below 750 m.s.l. "as required in connection with the operation and maintenance of the Tom Jenkins Dam and Reservoir Project." 1963 Deed at 2. The deed contains no express language concerning mining operations or coal interests. The deed recites the 1948 Agreement's language that the easement operates as required by the United States of America "for flood control, erosion and water supply purposes." Id. at 1.

In December 2009, the Ohio General Assembly passed into law O.R.C. 1541.083, giving the chief of the division of parks and recreation authority to enter into "leases granting permission to take and remove . . . coal by underground mining methods . . . from beneath the surface of Burr Oak state park in Athens and Morgan counties pursuant to lease agreements and real estate transactions that have been entered into not later than January 1, 2011, if the chief finds that such taking and removal will in no way affect the surface of the land or the use of the land as a public park. As the chief deems in the best interest of the state, those leases may be made either upon a royalty or rental basis, and may be either for a term of years or until the economic extraction of the mineral covered by the lease has been completed. Upon request from the lessee of any such lease, the chief may consent to its cancellation, but any equipment or improvement thereon owned by the lessee may be held as security by the chief for payment of all rentals, royalties, and damages."

Ohio entered into such an agreement with Buckingham on March 1, 2010. The "Exchange Agreement" had several aspects. In a land swap, Ohio obtained significant tracts of land creating a

"buffer zone" around Burr Oak Lake.  Buckingham obtained land and coal interests in tracts of land further removed from the Lake.  As part of the Exchange Agreement, Ohio agreed to lease a 41.14 acre tract (the "Corridor") to Buckingham for the purpose of extracting coal from beneath the surface of Burr Oak State Park.  The lease has an initial 5-year term, renewable for four additional, consecutive five-year terms.  March 11, 2011 Lease at ¶2.  Buckingham will pay Ohio a royalty of 4% of the gross sales price on each ton of coal extracted, plus an annual payment.  Id., ¶5.

Buckingham owns coal rights for tracts of land east and west of the Corridor.  Buckingham has extensively mined its reserves on the west tract and will exhaust those reserves in 1 to 3 years.  In order to fulfill its supply contract obligations with American Electric Power, Buckingham intends to mine the coal seam in the east tract.  The Corridor would provide Buckingham with access to the east reserves in the most economic fashion and in a manner least disruptive to the surface land.

It is undisputed that Buckingham's proposed design for the Corridor meets and exceeds all applicable specifications of the Mine Safety and Health Administration (MSHA), whose concern is with the safety and health of the mine workers.  Buckingham has applied for and been granted the federal and state permits needed to move forward with excavating the Corridor.  The Corridor will feature 4 parallel entries ranging from 735 to 878 linear feet.  The Corridor will be about 60 feet below the surface, including 60 feet below where the East Branch of Sunday Creek crosses the surface above the Corridor.  Each entry will be 5-6 feet high and 17 feet wide.  The "chevron" design of the Corridor is best seen in Exhibit A tendered by Buckingham at the May 11, 2011 hearing.  In essence, there will be a series of cross-cuts at a 60 degree angle to the entries.  The cross-cuts will connect the 4 parallel entries and provide ventilation.  The chevron design incorporates large, solid, unexcavated trapezoidal pillars of coal meant to enhance the structural stability of the roof of Corridor.

The Corps has known of Buckingham's intentions for some time.  Buckingham submitted an application for a mining permit with the Ohio Department of Natural Resources (ODNR) in August 2009.  Ohio Ex. B-1.  The Chief of the Regulatory Branch of the Huntington District of the U.S. Army Corps of Engineers was copied on the application.  In February 2010, the Corps learned that the ODNR had scheduled a public meeting on the permit for March 1, 2010.  Corps personnel attended

4

the meeting.  The Corps District Engineer, Colonel Robert D. Peterson, testified that he personally became aware of the matter in March 2010 when his staff advised him of the lease and the permit, which ODNR approved on March 12, 2010.

On April 22, 2010, Col Peterson sent a letter to the Director of the ODNR in which he expressed his objection to the mining plans.  U.S. Ex. 11.  After various meetings, Ohio confirmed on July 6, 2010 that Buckingham would hold off on its plans.  This came just a few days after MSHA had issued a permit to Buckingham to carry on mining operations in the Corridor.  Buckingham Ex. F.  The Corps contacted MSHA to re-examine the permit in light of its concerns about the potential of reservoir waters resting over the Corridor – essentially, the possibility that during periods of heavy rains, the reservoir level would rise above 725 m.s.l. and add lake water to the East Branch, which is normally a shallow tributary of a few feet in depth.  MSHA revoked or suspended the permit on December 21, 2010 to conduct a second review, but it reissued the permit on March 14, 2011.  Buckingham Exs. G and H.

The Executive Vice President of Buckingham Coal Company, Ronald Bird, testified that Buckingham has begun work in the Corridor.  It is currently excavating the 4 parallel entries, and as of May 10, 2011 had completed 40% of the project, as seen in Exhibit A tendered by Buckingham at the May 11, 2011 hearing.  All 4 entries have progressed under and beyond the East Branch of Sunday Creek.  The daily progress on May 10, 2011 was 75 linear feet.

On May 4, 2011 the United States filed this suit for declaratory relief, preliminary and permanent injunctive relief, and damages.  It filed its motion for a temporary restraining order on May 6.

## II.    Discussion

### A.    Legal Standard

Temporary restraining orders are available under Rule 65(b) of the Federal Rules of Civil Procedure.  They are extraordinary remedies that are governed by the same considerations that a court must take into account when examining a motion for a preliminary injunction: "(1) whether the movant has a strong likelihood of success on the merits, (2) whether the movant would suffer irreparable injury

absent a stay, (3) whether granting the stay would cause substantial harm to others, and (4) whether the public interest would be served by granting the stay." Ohio Republican Party v. Brunner, 543 F.3d 357, 361 (6th Cir. 2008); see also Winter v. Natural Resources Defense Council, Inc., 555 U.S. 7, 129 S.Ct. 365, 374 (2008).

**B.      Likelihood of Success on the Merits**

The United States argues that Ohio promised in the 1948 Agreement and subsequent documents not to grant coal interests in the Project land or to allow mining operations. But the fatal flaw to the United States' ability to show a strong likelihood of success is the absence of express language in the relevant documents to that effect. The Agreement requires Ohio to acquire all land and interests connected with the Project and to grant a perpetual flowage easement to the United States. The Agreement contains no language expressly prohibiting Ohio from conveying interests in the lands.

The United States points to the Real Estate Planning Report as the most definitive source of the limitation it proposes. The Report, however, was far from definite in the language it employed. The Report "estimated" that it would "be necessary for the State to acquire the coal, oil and gas [interests], and to extinguish outstanding rights thereto, in the lands (approximately 1,450 acres) underlying elevation 750 [m.s.l.]" Report at 6. The Report "considered" that "operation of the reservoir [would] prevent future mining" and further stated that it was at that time "considered desirable that mining operations be prohibited within or upon the entire easement area." Id. at 7. The Report, however, contained no express prohibition on Ohio's ability to convey coal interests.

Likewise, the 1962 and 1963 deeds did not restrict Ohio from conveying coal interests. This is of particular importance because the deeds were the instruments through which Ohio fully acquired outright title and coal rights to all of the Project lands and then granted a flowage easement to the United States. These instruments are the means by which property interests are recorded under Ohio law and by which subsequent bona fide purchasers are given notice of the nature and extent of property interests. O.R.C. 5301.25(A).

The court thus finds that the United States has failed to show a strong likelihood of success on the merits. The relevant agreements speak in terms of contemplations and what the parties considered

6

"desirable" at the time – hardly the foundation needed for showing a *strong* likelihood of success on the merits. When it came time in the deeds to record the purported contemplations, the parties chose not to do so. The deeds instead simply conveyed a perpetual flowage easement to the United States.

The best argument the United States is left with is that the flowage easement, by definition, excludes any uses or interests that would interfere with the enjoyment of its easement. See United States v. Hughes, 408 F.2d 619, 621 (6th Cir. 1969); Crane Hollow, Inc. v. Marathon Ashland Pipe Line, LLC, 138 Ohio App.3d 57, 66 (Ohio Ct. App. 2000). The flowage easement, as recited in the Agreement, Report, and 1963 Deed was required by the United States for flood control, erosion, and water supply purposes. The United States argues that Buckingham's mining activity in the Corridor raises the risk of subsidence and that reservoir waters will seep into the mining area and escape from the control of the Corps, thereby interfering with its ability to have full flood control over all reservoir water. This argument inevitably depends upon what the risk of subsidence actually is, which is a question the court will address in relation to irreparable injury. Suffice it to say that because the court finds, as explained below, that the United States has failed to establish a material likelihood that subsidence will occur, even the United States' best legal argument does not have a strong likelihood of success on the merits.

C.    **Irreparable Injury**

The movant must show that "irreparable injury is *likely* in the absence of an injunction." Winter, 129 S.Ct. at 375 (emphasis in original). A mere possibility of injury is not enough. Id.

The United States believes that Buckingham's mining activity will increase the risk of subsidence. In other words, it believes that the layers of soil, clay, and rock between the land surface (or bottom of the East Branch creek bed) and the roof of the mine will be compromised or fractured in a way that allows surface and stream water to pass or flow down into the mine. As Col. Peterson testified, if this process happens, the water would escape the control of the Corps, could possibly become contaminated (which Col. Peterson referred to as acid mine drainage), and ultimately enter the water supply in a time and place over which the Corps has no control. When asked to state what he understands the likelihood of subsidence to be, Col. Peterson admitted that he could not quantify the risk and stated that subsidence was simply a concern that had been raised by his staff. He admitted also that he had not

made a determination that the proposed mining activities would reduce the flood carrying capacity of the Project. See 1948 Agreement, Art. I, §8 (prohibiting "the location and/or maintenance of any future encroachments, structures or obstructions therein which, in the opinion of the said District Engineer, reduces or tends to reduce the flood carrying capacity of said Branch and Channel").

The experts who testified agreed that there are different types of subsidence, but that chimney subsidence is the only type of concern to the Corridor. Chimney subsidence occurs at the level of the mine roof when the roof layer becomes compromised or erodes and falls to the floor of the mine. Over time, more of the roof falls, narrowing the distance between the land surface and the roof of the mine.

Upon consideration of the evidence submitted, the court concludes that there is no likelihood of chimney subsidence occurring at the Corridor. Buckinghams' expert, Dr. Vincent A. Scovazzo (a director of geotechnical services with the mining engineering consulting firm John T. Boyd Co.) gave the most complete, well-supported, and credible testimony on the matter. The earth located above a mine is known as "overburden." Dr. Scovazzo explained that the risk of chimney subsidence depends on the depth and composition of the overburden. Those factors are not in dispute here. The depth of the overburden is about 60 feet and the composition of the overburden is known to be 14-22 feet of unconsolidated material (soil, gravel, clay) and 38-46 feet of consolidated material (sandstone, shale). Moreover, a high percentage of the individual consolidated material layers exceed 5 feet in depth. See also U.S. Ex. 15 (drill logs). In Dr. Scovazzo's opinion the relatively high ratio of consolidated material to unconsolidated material and the high ratio of consolidated material layers exceeding 5 feet means that the overburden is "strong" and it significantly reduces the likelihood of chimney subsidence. He noted too that the underclay layer immediately below the coal seam was so shallow that it made for a strong mine floor and foundation for the pillars and mining equipment.

The State of Ohio's expert, Jason Craven of the ODNR, added that the sandstone layers were of particular importance. He described sandstone as a "dominant overburden" whose strength lowers the risk of "pillar punching," whereby the solid coal pillars punch into the layer above them.

The risk of chimney subsidence also depends in part of the aspects of the mine entries and pillars. Dr. Scovazzo testified that the relatively narrow width of Buckingham's entries (17 feet)

dramatically increases the strength of the roof, as does the relatively large support pillars (80 feet wide by 100 feet long, measured center-to-center) and the chevron design featuring 60 degree cross-cuts. Dr. Scovazzo testified that the ARMPS (analysis of retreat mining pillar stability) stability factor for the Buckingham mine was 5.5, greatly more than the 1.5 factor recommended for a 60 foot depth.

Dr. Scovazzo concluded that there is no material risk of chimney subsidence during the current preparation phase, the production phase (which will last no more than 20 years and during which the Corridor will function as a thoroughfare for workers, equipment, air ventilation, pipes, belts, and electricity), and finally the abandonment phase. Mr. Craven also testified that he has concluded that there is no risk of subsidence in connection with the Corridor.

Because time is a factor in subsidence and because part of the safety system used to support the mine roofs are steel bolts that could ultimately corrode, the risk for chimney subsidence always exists. Dr. Scovazzo persuasively explained, however, why such a risk does not translate into a likelihood of irreparable injury to the United States once the Corridor is abandoned. As an initial matter, the roof fall will ultimately choke itself out; that is, at some point the rubble pile of fallen rock with reach up to the ceiling. As rock material falls to the floor, it takes up more volume than it occupied when in the rock layer bed. Sandstone "swells" at a rate of 25%, but even assuming a swell rate of 15%-20%, Dr. Scovazzo calculated that roof fall would cease at 38 feet above the mine floor, leaving 10 feet or more of undisturbed rock layer in the overburden, not to mention the 14-22 feet of unconsolidated material. Secondly, water from the aquifer layers (including the sandstone and the coal seam layers) will over time fill the open spaces in the mine entries and cross-cut passages. This is a desirable and inevitable process (unless other man-made measures are taken first), as water provides a stabilizing force and reduces the load on the roof by 38%, according to Dr. Scovazzo. Finally, he described numerous measures that can be taken once the mine is abandoned that greatly mitigate the risk of chimney subsidence. These include injections of sand, gravel, or slurry.

Dr. Scovazzo also noted the layer of clay present in the overburden. Putting chimney subsidence issues aside, clay has a low permeability and indeed the presence of clay is part of what shaped the creek bed for the East Branch. Thus, there is little likelihood of reservoir waters escaping.

9

But even if such waters did escape through stream capture or subsidence, Dr. Scovazzo explained that the Corridor would hold only 2.16 thousand acre feet of water. Even the longest entry is 878 linear feet, and all of the entries are just 17 feet wide by 5-6 feet high. In other words, if the Corps lost water from its control, it would not really be that much.

The United States' expert, Richard Allwes (a structural engineer for the Corps) testified that he believed that there is a likelihood of subsidence at the Corridor, but he could not estimate the precise likelihood of the risk, nor could he estimate when it would likely occur. Moreover, despite attributing the risk of subsidence to progressive roof failures, Mr. Allwes failed to account for the numerous factors that Dr. Scovazzo so thoroughly explained would mitigate the risk of chimney subsidence. He also opined, without explanation, that subsidence would be most likely to occur from a water "break-through" into the mine when there are events that raise the reservoir level above 725 m.s.l. Though the United States established that water levels do occasionally go above 725 m.s.l. (most recently for a few days in April 2011), the notion of a "break-through" is unsupported on the record and lacks a basis in the type of site-specific factors that Dr. Scovazzo founded his opinion upon.

In sum, the court finds that the United States has failed to establish a likelihood that it will suffer irreparable injury absent a restraining order. To the contrary, the evidence clearly establishes that the United States is unlikely to suffer an irreparable injury.

### D. Harm to Others and the Public Interest

The evidence as to the final factors are strongly in the defendants' favor. The declaration of Robert Bird establishes that Buckingham has a contractual obligation to supply coal to American Electric Power through March 31, 2020. Its ability to access the reserves in the east tract is critical to its ability to fulfill the contract. Without the Corridor, Buckingham will need to engage in a far more expensive and environmentally-disruptive method of accessing the reserves.

Buckingham also correctly notes the inequity of being forced to halt progress on the Corridor, when the United States waited until the project was well underway to file this lawsuit. The Corps has known of Buckingham's plans for well over one year, before Buckingham obtained the necessary permits. Buckingham even voluntarily refrained from starting the project, despite having the mining

permits in hand.  Yet the United States did not seek declaratory or injunctive relief until now.  To halt

the project now would, as Mr. Bird's declaration describes in fuller detail, result in economic harm to

Buckingham, which has expended a great deal of resources on the Corridor project.

Finally, Ohio's lease agreement with Buckingham was specifically authorized by the General

Assembly and represents the legislative body's considered judgment that it serves the best interests of

the citizens of Ohio.  As a result of the land swap, the ODNR favorably obtained lands to form a buffer

zone around Burr Oak Lake and ensure its enjoyment to the public.

**III.    Conclusion**

Accordingly, the United States' application for a temporary restraining order (doc.  8) is

DENIED.

s/ James L. Graham
JAMES L. GRAHAM
United States District Judge

DATE: May 12, 2011