# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

United States of America,

            Plaintiff,

    v.

Buckingham Coal Company, et al.,

            Defendants.

Case No. 2:11-cv-383

Judge Graham

Magistrate Judge Kemp

OPINION AND ORDER

This matter is before the Court on summary judgment motions filed by plaintiff United States of America (doc. 47), defendant Buckingham Coal Company (doc. 73), and defendant the State of Ohio (doc. 77).  For the reasons that follow, the United States' motion for summary judgment is DENIED and defendants' motions for summary judgment are GRANTED.

## I.  Factual Background

The subject of this lawsuit is the coal mineral interests in the land associated with the Tom Jenkins Dam and Burr Oak Reservoir ("the Project").  The Project was constructed by the United States Army Corps of Engineers ("the Corps") in partnership with the State of Ohio ("the State" or "Ohio").  Doc. 42 ¶¶ 1, 2.  The United States and Ohio executed an agreement ("Articles of Agreement" or the "Cooperative Agreement") in 1948, which delineates the parties' obligations with respect to the project lands.  Doc. 42 ¶ 2.  Under the Cooperative Agreement, Ohio obtained fee simple title to the land that would be covered by the reservoir, including coal mineral interests.  Doc. 42 ¶ 2.  The Agreement also required Ohio to grant the United States a perpetual flowage easement for "flood control, erosion and water supply purposes."  Doc. 42 ¶¶ 2, 18(b). The parties acted

according to these agreements without incident until February 2010 when the United States learned of a proposal to mine coal under the project lands.  Doc. 42 ¶ 25.

Between January and March 2010, Ohio executed two coal mining leases and an "Agreement for Exchange of Coal Rights" with Buckingham Coal, under which Buckingham obtained the rights to mine coal beneath the surface of the project lands.  Doc. 42 ¶ 3; doc. 51 ¶¶ 7-10.  The mineral rights that Ohio leased to Buckingham include rights that Ohio obtained pursuant to the Agreement with the United States. Doc. 42 ¶¶ 3, 4.  The Corps learned of and objected to Buckingham's plans to mine under Project lands.  Doc. 42 ¶¶ 26, 27.  Pursuant to a Mine Safety and Health Administration-issued permit, Buckingham began mining operations.  Doc. 42 ¶ 28; doc. 51 ¶ 14.

The United States subsequently initiated this action against the State of Ohio and Buckingham Coal Company on May 4, 2011 seeking declaratory relief, preliminary and permanent injunctive relief, and damages. *See* doc. 1.  On May 6, 2011, the United States filed a motion for a temporary restraining order, seeking to prevent Buckingham from excavating, mining, or otherwise disturbing the ground beneath the project lands. *See* Doc. 8.  This Court denied the motion on May 12, 2011.  Doc. 23.  All parties now seek summary judgment.

A number of congressional acts, agreements, and reports provide the background on which the parties rest their substantive legal arguments.  The Flood Control Act of 1936 (the "1936 Act"), Pub. L. No. 74-738, 49 Stat. 1570, 1570-72 (1936), establishes a program in which the federal government, acting through the Corps, may engage in cooperative flood control projects with states and local governments. Id. at 1570.  The purpose of such cooperative projects is flood control. Id. § 1.  The act establishes a limited number of specific requirements for how the Corps and states are to engage in such projects.  A few such requirements are relevant here: States must "provide without

cost to the United States all lands, easements, and rights-of-way necessary for the construction of the project, except as otherwise provided herein . . . ." Id. at 1571. They must also "maintain and operate all the works after completion in accordance with regulations prescribed by the Secretary of War . . . ." Id. States must share the cost of flood control projects, and "the Secretary of War shall determine the proportion of the present estimated cost . . . that each State . . . should contribute in consideration for the benefits to be received . . . ." Id. The 1936 Act also authorized an inaugural group of flood control projects. The project at issue here was not among those initial projects but was established by a later act.

By a 1937 Act, Congress added a provision to the Flood Control Act that required states participating in flood control projects to adhere to federal purposes in certain situations:

> [T]he Secretary of War is authorized to receive from States and political subdivisions thereof, such funds as may be contributed by them to be expended in connection with funds appropriated by the United States for any authorized flood control work whenever such work and expenditure may be considered by the Secretary of War, on recommendation of the Chief of Engineers, as advantageous in the public interest, and the plans for any reservoir project may, in the discretion of the Secretary of War, on recommendation of the Chief of Engineers, be modified to provide additional storage capacity for domestic water supply or other consideration storage, on condition that the cost of such increased storage capacity is contributed by local agencies and that the local agencies agree to utilize such additional storage capacity in a manner consistent with Federal uses and purposes . . . .

Pub. L. No. 75-208, 50 Stat. 515, 518 (1937), codified as amended at 33 U.S.C. § 701h.

In 1944, Congress authorized the project at issue here. Pub. L. No. 78-533, 58 Stat. 887, 898 (1944). In the 1944 Act, Congress reaffirmed policy goals similar to those set forth in the Flood Control Act of 1937, specifically

> the policy of the Congress to recognize the interests and rights of the States in determining the development of the watersheds within their borders and likewise their interests and rights in water utilization and control, as herein authorized to

preserve and protect to the fullest possible extent established and potential uses, for
all purposes, of the waters of the Nations's rivers . . . .

58 Stat. at 888.  The 1944 Act also established substantive and procedural requirements for the

submission of flood control plans to Congress.  Id.  Under this system, the Chief of Engineers of the

War Department may submit a plan for Congressional approval.  Affected states may make

comments and alternate recommendations for Congress to consider.  Id. at 888-89.

Congress approved a number flood control projects "for the benefit of navigation and the

control of destructive flood waters and other purposes" in the 1944 Act.  The Burr Oak Reservoir

was among those projects, and it was authorized to be completed "substantially in accordance" with

the plan set forth in a 1942 letter from the Secretary of War.  58 Stat. at 898.  That document presents

a detailed description of the region, plan details for the Burr Oak Reservoir and other potential

projects, and a detailed cost-benefit analysis, including the estimated costs for the project.  It also

recommends a number of conditions on the project, that must by satisfied by "local interests."  For

example, local interests must contribute to the cost of the project, and must assure the Secretary that

they will "protect the flood-carrying capacity of the Sunday Creek channel downstream from the dam

from any future encroachments or obstructions which would reduce the protection afforded by the

project, and . . . maintain and operate the water supply features of the project, including the policing

of the reservoir area."  H.R. Doc. No. 77-762, at 60 (1942).

The 1944 Act also gives the Secretary of war a limited regulatory power "to prescribe

regulations for the use of storage allocated for flood control or navigation at all reservoirs

constructed wholly or in part with Federal funds provided on the basis of such purposes, and the

operation of any such project shall be in accordance with such regulations."  58 Stat. At 890.

Subsequent to Congressional authorization of the project, the Corps's Division Engineer began more specific planning and in September 1947 issued a Definite Project Report.  See doc. 47-8.  Though it does not appear that Ohio signed on to the Definite Project Report or agreed to its recommendations at the time it was published, a subsequent agreement between Ohio and the Corps acknowledges its existence: "WHEREAS, an Act of Congress approved . . . construction of the Burr Oak Dam and Reservoir Project . . . including the acquisition of lands and/or interests in land as provided in the Definite Project Report . . . ."  Doc. 47-1 at 1.

The Definite Project Report includes provisions that are specific to the coal interests that are at issue here as well as the Corps's view of the expenditures to be made on the project, the title to land to be acquired, and the purposes of the project.  Regarding coal, the report acknowledges that "[a]lthough it is known that coal deposits of commercial value underlie the reservoir area, there are no past or present coal mining operations in the area proper."  Doc. 47-8 at 4.  The Corps' position that coal under the reservoir is not mineable is evident:

> There is no mineable coal above drainage, but two mineable seams, the No. 7, or Upper Freeport coal, and the No. 6, or Middle Kittanning coal, underlie the reservoir area. . . .  None of the coal underlying the reservoir area has been mined.  However, the No. 6 and No. 7 seams have been extensively mined for many years in the general vicinity of the project . . . .  Practically all of the coal in the reservoir area is owned by coal companies or individuals other than the owners of the surface.  Since operation of the reservoir will prevent mining of the underlying coal, it will be necessary to acquire all coal rights in the lands below elevation 740 feet, plus a horizontal barrier averaging 50 feet in width beyond this elevation for protection of adjacent coal measures from seepage.

Doc. 47-8 at 5-6.  The plan estimates that acquisition of these coal interests will cost $37,500.  Doc. 47-8 at 7.  This estimate was based on the assumption that title in the land would be acquired in fee simple.  Id.  The plan further contemplates that the United States will acquire the land and construct the project, subject to partial reimbursement by the State of Ohio.  Id.

In early 1948, the United States and the State of Ohio entered into an agreement "in order that construction of [the] project may be commenced . . . ." Doc. 47-1 at 2. As noted above, the agreement acknowledges the Definite Planning Report, but it departs from that plan in some ways. For example, the Definite Report suggests that the United States will acquire the necessary land, but according to the agreement, the state was to

> acquire all lands and/or interests in land necessary for said Project, except those necessary for the dam site [etc.], and convey to the Government a perpetual easement, free and clear of all objectionable liens and encumbrances, upon said lands and/or interests in lands up to elevation 750.0 feet above sea level, all as required by the Government for flood control, erosion and water supply purposes, retaining all other lands and /or interests in land for development of the recreation and conservation features of said Project . . . .

Doc. 47-1 at 2. The agreement provides that the United States may acquire project lands if "the land acquisition program of the State is not proceeding at a satisfactory rate of progress . . . ." Doc. 47-1 at 5. The agreement clearly envisions further planning of the land-acquisition process: "Such acquisitions shall be in accordance with the land acquisition program to be agreed upon between the . . . District Engineer and the State, and approved by the . . . Chief of Engineers . . . ." Doc. 47-1 at 3.

In addition to general provisions for the acquisition of land, the agreement sets forth requirements and rights of the parties. The agreement required Ohio to provide $495,000 for the project and retain another $290,000 for land acquisition. Doc. 47-1 at 2-3. The United States was required, *inter alia*, to build the dam. Doc. 47-1 at 8. Though coal rights are not directly addressed by the agreement, other rights of the parties are. For example:

> The state shall have the right to use the water area of Burr Oak Reservoir for recreation and conservation purposes; provided, however, that no use shall be exercised which, in the opinion of said District Engineer, is incompatible with the flood control and water supply features of said project.

6

Doc. 47-1 at 6.  The agreement similarly "reserves" to the United States rights to enter and conduct certain types of work on project lands.  Doc. 47-1 at 7.

Approximately nine months after the United States and the State of Ohio signed the Agreement, the Corps completed and representatives of both parties signed a Real Estate Planning Report.  This report expresses a plan similar to that expressed in the agreement whereby the State was to acquire the reservoir land and provide the United States with an easement.  Unlike the prior agreement, the Real Estate Planning Report includes details that are specific to coal interests in the project lands.  The plan estimates "that it will be necessary for the State to acquire the coal, oil and gas, and to extinguish outstanding rights thereto, in the lands . . . underlying elevation 750."  Doc. 47-3 at 9.  The plan clearly does not envision mining operations:

> [I]t is considered that, since operation of the reservoir will prevent future mining, it will be necessary for the State to acquire the coal underlying the lands below elevation 740, the spillway crest level, plus the coal in a barrier sufficient in width beyond this elevation to protect adjacent coal measures from seepage. . . . [I]t is considered desirable that mining operations be prohibited within or upon the entire easement area.  Accordingly, it is proposed that the State acquire, as a minimum requirement, the coal in the lands lying below elevation 750.

Doc. 47-3 at 10.

The Real Estate Planning Report also details the type of title that it was envisioned the state would acquire in project land.  In short, the Report envisions that the state will obtain fee simple title in project lands because it concludes that the project will prevent any other beneficial use of the land.  See doc. 47-3 at 15 ("Although the reservoirs lands above elevation 730 will be flooded infrequently enough to permit continued farming operations, it is proposed, as a general policy, that the State acquire fee title to all lands within the real property taking line . . . .").  The Report further states that

"[a]s a general policy, fee title be acquired by the State to all lands within the proposed real property

taking line . . . ." Doc. 47-3 at 23.

The Real Estate Planning Report also covers, in greater detail than the prior agreement, the

sources of funding for land acquisition. See doc. 47-3 at 20. The Report is clear that the state is to

set aside $290,000 for land acquisition, and any portion of that amount that is not spent on such

acquisition was to be paid to the United States. Id. Finally, the Report contains one provision that

suggests some level of continued federal control over project lands:

> As provided in the agreement, the State will retain and utilize the lands acquired
> above elevation 750 for development of conservational and recreational features of
> the project, it being expressly understood and agreed that sale or disposal of any
> lands acquired by the State, pursuant to the agreement, will be subject to prior
> approval of the District Engineer.

Doc. 47-3 at 15.

The arguments put forth by each party in their summary judgment motions are, to a large

extent (though not exclusively), based on the Congressional Acts and documents detailed above,

specifically the 1937 and 1944 Acts, the Definite Project Report, the Agreement, and the Real Estate

Planning Report.

## II. Legal Standard

Under Federal Rule of Civil Procedure 56, summary judgment is proper if the evidentiary

materials in the record show that there is "no genuine dispute as to any material fact and the movant

is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see Longaberger Co. v. Kolt, 586

F.3d 459, 465 (6th Cir. 2009). The moving party bears the burden of proving the absence of genuine

issues of material fact and its entitlement to judgment as a matter of law, which may be

accomplished by demonstrating that the nonmoving party lacks evidence to support an essential

element of its case on which it would bear the burden of proof at trial.  See Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Walton v. Ford Motor Co., 424 F.3d 481, 485 (6th Cir. 2005).

The "mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986) (emphasis in original); see also Longaberger, 586 F.3d at 465.  "Only disputed material facts, those 'that might affect the outcome of the suit under the governing law,' will preclude summary judgment."  Daugherty v. Sajar Plastics, Inc., 544 F.3d 696, 702 (6th Cir. 2008) (quoting Anderson, 477 U.S. at 248).  Accordingly, the nonmoving party must present "significant probative evidence" to demonstrate that "there is [more than] some metaphysical doubt as to the material facts."  Moore v. Philip Morris Cos., Inc., 8 F.3d 335, 340 (6th Cir. 1993).

A district court considering a motion for summary judgment may not weigh evidence or make credibility determinations.  Daugherty, 544 F.3d at 702; Adams v. Metiva, 31 F.3d 375, 379 (6th Cir. 1994).  Rather, in reviewing a motion for summary judgment, a court must determine whether "the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  Anderson, 477 U.S. at 251-52.  The evidence, all facts, and any inferences that may permissibly be drawn from the facts must be viewed in the light most favorable to the nonmoving party.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Eastman Kodak Co. v. Image Technical Servs., Inc., 504 U.S. 451, 456 (1992).  However, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff."  Anderson, 477 U.S. at 252; see Dominguez v. Corr. Med. Servs., 555 F.3d 543, 549 (6th Cir. 2009).

### III.    Plaintiff's Summary Judgment Motion

The United States seeks summary judgment solely on its claims against the State of Ohio: count 1 for declaratory relief and count 2 for breach of legal obligations.  Doc. 47.  The United States does not seek summary judgment against Buckingham on claim 3 for intentional interference with a contract.  In its summary judgment and reply briefs, the United States makes a large number of arguments, some of which are not clearly identified or fully explained.  Generally, the government makes two types of arguments: that contract principles and binding agreements prohibit Ohio from allowing coal mining on project lands, and that relevant statutes and documents incorporated into or propagated under the relevant statutes prohibit the coal mining.  The existence and contents of the relevant statutes is not under dispute.  In this order, the Court construes the effect of those documents as a matter of law.  See Royal Ins. Co. of America v. Orient Overseas Container Line Ltd., 525 F.3d 409, 422 (6th Cir. 2008).

In both its contractual and statutory claims, the United States faces the same fundamental challenge–none of the acts, agreements, reports, or plans that form the legal basis for the Burr Oak Reservoir project clearly and explicitly prohibit Ohio from leasing coal interests in project lands owned by the state.  Facing this challenge, the United States makes a number of assertions based on its contractual and statutory arguments, including that: 1) relevant agreements and plan documents demonstrate an understanding on the part of the State of Ohio and the Corps that coal mining would not occur on project lands; 2) the agreements and plan documents require Ohio to "retain" project lands, including mineral interests; 3) Ohio's use of project lands must be consistent with a federal purpose; and 4) Ohio's agreement to contribute a certain sum to the project prevents it from gaining

10

any income from project lands that it holds in fee simple. Each of these arguments is addressed in turn.

a. Enforceability of an understanding that coal mining would not take place on project lands

The United States argues that the parties to the several reports and agreements understood that coal mining would not take place on project lands, and that the Court should enforce this understanding. Several of the documents do demonstrate a belief that coal mining would not be possible on project lands. None of the congressional acts either establishing the general concept of flood control projects or establishing this particular project directly mention coal mining or the lease of mineral interests. However, subsequent reports do. The Corps's Definite Project Report is quite clear in this regard: "Since operation of the reservoir will prevent mining of the underlying coal, it will be necessary to acquire all coal rights in the lands below elevation 740 feet, plus a horizontal barrier averaging 50 feet in width beyond this elevation for protection of adjacent coal measures from seepage." Doc. 47-8 at 5-6. Similarly, the Real Estate Planning Report, signed by representatives of both the United States and the State of Ohio, suggests a shared idea that mining will not occur under the reservoir: "[I]t is considered that, since operation of the reservoir will prevent future mining, it will be necessary for the State to acquire the coal underlying the lands below elevation 740, the spillway crest level, plus the coal in a barrier sufficient in width beyond this elevation to protect adjacent coal measures from seepage . . . . [I]t is considered desirable that mining operations be prohibited within or upon the entire easement area." Doc. 47-3 at 10.

The United States argues, *inter alia*, that these provisions form contractual promises that prevent Ohio from permitting coal mining on project lands. "A promise is a manifestation of

intention to act or refrain from acting in a specified way, so made as to justify a promisee in understanding that a commitment has been made."  Restatement (Second) of Contracts § 2.

But the Planning Report does not use the language of an enforceable covenant.  Rather, the report expresses a preference for a "desirable" result.  Neither the Definite Project Report, nor the Real Estate Planning Report would justify the United States in understanding that Ohio had committed not to permit coal mining on project lands.  The Planning Report contains a clear statement of preference—"it is considered desirable."  Such a statement of preference would be meaningless had Ohio *committed* to not permitting coal mining.  It alone is not a promise not to permit coal mining.  The Definite Project Report similarly states only an assumption, that operation of the reservoir will prevent coal mining.  That the assumption has turned out to apparently be false does not transform it into a binding covenant.

There is a second problem with seeking to enforce the Definite Project Report against Ohio as a contract.  The state has not explicitly signed on to or agreed to abide by that report.  The United States argues that it was memorialized by and incorporated into the 1948 Agreement between the parties.  Doc. 47 at 30.  That agreement does recognize the Definite Project Report: "WHEREAS, an Act of Congress . . . authorized construction of the Burr Oak Dam and Reservoir Project . . . including the acquisition of lands and/or interests in land as provided in the Definite Project Report . . . ."  Doc. 47-1 at 1.  The parties here have simply recognized that Congress has authorized the construction of the reservoir.  Congressional authorization of a joint federal-state project does not alone impose an obligation on a state to participate.  Cf., New York v. U.S., 505 U.S. 144, 176-77 (1992) (Congress "may not conscript state governments as its agents.").  In this whereas clause, the parties recognize the existence of congressional authorization, and the existence of the Definite

Project Report.  The Report is a planning document unilaterally created by the Corps for a project to which Ohio had not yet agreed.  The 1948 agreement is clearly not intended to bind the parties to the Definite Project Report.  Further, the Agreement establishes a plan that diverges from the Definite Project Report.  The Report suggests that the United States acquire the land for the project and be partially reimbursed by the state, doc. 47-8 at 7, while the Agreement manifests an intention that Ohio will acquire most of the necessary land, doc. 47-1 at 3.  In this context, the United States could not reasonably have expected that Ohio would be bound by terms of the Definite Project Report that merely states an assumption underlying the report.

> b. Provisions suggesting that the State's interests in land are to be "retained" or that Ohio
> may not "dispose" of them without Corps approval

The United States next points to several provisions, mostly in the Real Estate Planning Report, that suggest that the State of Ohio is required to "retain" project lands.  For example, the government argues that "[t]he parties' agreement required that Ohio 'acquire *and retain* title to all lands, or interests in lands, in the reservoir area . . ." and that this prevents Ohio from leasing coal interests because Ohio must "retain" them.  Doc. 47 at 26 (quoting the Real Estate Planning Report). When quoted in context, the meaning of the provision in the Planning Report is not as clear as the government suggests.  The Planning Report states:

> It is contemplated that the United States will acquire and retain title to the dam site and construction areas, and the State will acquire and retain title to all lands, or interests in lands, in the reservoir area, conveying, however, to the United States, in sole consideration of the agreement . . . a perpetual easement free and clear of all objectionable liens and encumbrances over such lands up to contour elevation 750 feet (m.s.l.), as required by the Untied States for flood control, erosion, and water supply purposes.

Doc. 47-3 at 6. The United States seeks an interpretation of the word "retain" that would carry a broad effect–a perpetual disability on land owned in fee simple by the state. The easiest and most sensible way to indicate an attempt to create such a disability would be to use the word "perpetual." In fact, the Planning Report makes it clear that the United States easement is to be perpetual by saying so. It does not, though it easily could have, require the state to retain any interest in land "perpetually." Instead, it simply requires the government and the state to "retain" respective project lands.

The most reasonable interpretation of the word "retain" in this context is not to create a permanent disability on land that is not recorded in any deed or conveyance. Instead, the word is here most reasonably interpreted to refer to the party that walks away from the completion of the project in possession of the land. The Planning Report calls for both the government and the state to acquire some land. For the most part, each side is to "retain" the land that they acquire. However, in some situations, the United States may acquire land that the state then "retains." See Agreement, Art. III, doc. 47-1 at 5. The party "retaining" the land is the one that is to hold it after its acquisition. Had either party to the planning report intended that document to require such land to be held or retained *perpetually*, it should have used language clearly indicating so. Though the United States had substantial control over the drafting of the Planning Report, it now seeks an exceedingly expansive interpretation of that document's power. The argument is not well taken.

In addition to arguing that Ohio must permanently retain project lands, the United States argues that the Planning Report "obligates Ohio to seek Corps approval before disposing of Project lands." Doc. 47 at 31. According to the planning report: "[T]he State will retain and utilize the lands acquired above elevation 750 for development of conservational and recreational features of

14

the project, it being expressly understood and agreed that sale or disposal of any lands acquired by the State, pursuant to the agreement, will be subject to prior approval of the District Engineer." Doc. 47-3 at 15.  It is undisputed that the State of Ohio did not give the Corps' District Engineer the opportunity to approve any agreements between Buckingham and the State.  But the approval requirement is narrowly drawn.  It extends only to the "disposal of any lands acquired by the State, pursuant to the agreement." Id.  The coal mining leases between the State of Ohio and Buckingham may properly be regarded as the "disposal" of the coal that Buckingham may remove pursuant to the leases.  See, e.g., Jones v. Wood, 2 Ohio Dec. 75, 1895 WL 1388 at *8 (Ohio Com. Pl. 1895). Nonetheless, it is not clear that disposing of one interest in land constitutes the disposal of that land where the state continues to hold fee simple title and continues to have actual possession of the land. Moreover, the Real Estate Planning Report contains detailed provisions for the acquisition of coal interests.  Had the government wished to require the State to seek approval before disposing of a coal interest, it could very easily have made such a requirement clear.  The fact that the Planning Report speaks with such clarity regarding what coal interests are to be acquired for the project suggests that in the absence of such clarity, the state is not required to seek the District Engineer's approval prior to disposing of coal underlying project lands, which is distinct from disposing of the land itself.

### c. Provisions that the United States argues require Ohio to act in accordance with a federal purpose do not prevent the state from leasing mineral interests in project lands

The United States presents several arguments that Ohio is required to act in accordance with the "federal purpose" of the reservoir project, and that it violated that purpose by leasing mineral interests in the land underlying the reservoir.  The United States argues that the 1948 Agreement prevents Ohio from allowing mining under the reservoir because it agreed to "use Project lands for

15

Project purposes." Doc. 47 at 34. The United States identifies two provisions in the "whereas" clauses of the agreement to support its claim. The first provision simply acknowledges the existence and purposes of the Definite Project Report that was approved by Congress in the 1944 Act: "Whereas, the said approved plan for said Project provides for flood control, water supply, conservation, and recreational features to be financed by the Federal Government and the State of Ohio and/or other local interests . . . ." Doc. 47-1 at 1. This clause, which reiterates the purposes of a joint federal and state project, cannot plausibly be interpreted as a limit on state action. It neither incorporates the Definite Project Report nor otherwise limits Ohio's rights with respect to project lands. It does not purport to place any such limit, but simply gives the reasons and purposes for which the parties undertook the project.

The second provision in the Agreement identified by the United States does purport to place some requirement on the State of Ohio. It states that Ohio will convey an easement to the United States, and that Ohio will "retain[] all other lands and/or interests in land for development of the recreation and conservation features of said Project." Doc. 47-1 at 2. The basic requirement of this provision, that the state "retain" interests in land, has already been discussed. Other than requiring Ohio to "retain" interests in land for development of specific types of uses, this provision imposes no general requirement that Ohio act in accordance with federal purposes. There is no evidence that the sale of mineral rights has or will interfere with the "development of the recreation and conservation features of [the] Project." Doc. 47-1 at 2.

The United States also makes a number of arguments that Ohio is prevented by statute from alienating coal underneath project lands because the statutes delineate some federal purposes. The 1936 Act focuses narrowly on flood control and declares that "the Federal Government should

16

improve or participate in the improvement of navigable waters or their tributaries . . . for flood-control purposes . . . ." 49 Stat. at 1570. The 1937 Act elaborates on the specific purposes that are to be served by local participation in flood control projects. It presents such participation as serving a somewhat narrow purpose. The Corps may accept local funds for increased water storage capacity in flood control projects "on the condition that . . . the local agencies agree to utilize such additional storage capacity in a manner consistent with Federal uses and purposes." 50 Stat. 515, codified as amended at 33 U.S.C. § 701h. The 1944 Act has a broader focus and appears to give states much more leeway. It seeks to balance states' interests in controlling their territories with a federal desire to promote flood control projects. In that Act Congress "recognize[d] the interests and rights of the States in determining the development of the watersheds within their borders," while simultaneously seeking to "preserve and protect to the fullest possible extent established and potential uses, for all purposes, . . . the waters of the Nation's rivers . . . ." 58 Stat. at 888. In the 1944 Act, Congress approved a number of flood control projects, including the Burr Oak Reservoir project, "for the benefit of navigation and the control of destructive flood waters and other purposes."

The United States argues that Ohio has violated the 1937 Act "which imposed upon the state legal obligations associated with being a local partner in federal flood control projects, notably, here, that the reservoir be used 'in a manner consistent with Federal uses and purposes.' 33 U.S.C. § 701h."[1] Doc. 47 at 21-22. The Government quotes nine words from the 1937 Act. A slightly broader examination of the sentence quoted in part by the United States demonstrates its inapplicability here: "[T]he plans for any reservoir project may . . . be modified to provide additional

---

[1] The United States argues that the 1936 Act imposed this obligation, but the language quoted by the government is from the 1937 Act as codified at 33 U.S.C. § 701h. See 50 Stat. 515.

17

storage capacity for domestic water supply or other consideration storage, on condition that . . . the local agencies agree to utilize *such additional storage capacity* in a manner consistent with Federal uses and purposes." 33 U.S.C. § 701h (emphasis added).  Ohio did contribute to the project in order to obtain additional storage capacity, and 701h does require that such capacity must be used in a manner consistent with Federal uses and purposes.  The leasing of coal interests underlying the reservoir to Buckingham can not plausibly be described as the *utilization of additional storage capacity*.  Section 701h is inapplicable to the mining leases at issue here.

In its reply memorandum, the United States presents a more global argument, that the idea of "State primacy over lands acquired for the Project . . . flies in the face of the entire agreement." Doc. 81 at 6.  The major problem with this argument is that the United States is unable to ground it in specific words used in any statute or agreement.  Instead, the United States seems to argue that federal primacy over every facet of the project arises from a handful of statutory and contractual terms that simply do not say as much.  The United States argues that "[t]he law cabins Ohio's role at the Project, establishing the rules to which the state-participant agreed to in order to secure authorization for the Project . . . [T]here can be no question that the project authorization itself establishes the legal boundaries of Ohio's responsibilities and rights at the Project – including the Corps' broad operational authority." Doc. 81 at 7.  To support this idea, the United States provides a single case.  Environmental Defense Fund v. Alexander, 467 F.Supp. 885, 901 (N.D. Miss. 1979). It is unclear, and the United States does not explain, how this case supports its argument.  The cited portion of the decision appears to stand for the idea that in completing a specific project, the Corps has some leeway to diverge from a precise plan as approved by Congress.  It does not appear to

18

support the much broader proposition that the Corps has continuing, unilateral discretion over use of project lands that it does not own, decades after the project construction has been completed.

The United States argues that defendants have failed to understand the broader statutory scheme in which the Corps operates. Doc. 81 at 8-9. Though the United States asserts that this scheme grants the corps broad powers, it does not clearly explain how such powers statutorily limit Ohio's ability to sell the coal under project lands that it owns. The government argues at length that the 1942 report (the letter from the Secretary of War providing the initial investigation of the project) carries the force of law because it was incorporated into the 1944 Act. Doc. 81 at 8-10; see 58 Stat. at 898 (authorizing the flood control project "substantially in accordance with the recommendations of the Chief of Engineers in House Document Numbered 762" (the 1942 letter)). Yet the United States does not identify or cite anything in that letter, nor can the Court find anything in it that would support the government's broad assertions.

Finally, the United States makes an argument based on its conveyance of some project lands to Ohio. A portion of the project lands that Ohio now owns were purchased by the United States pursuant to Article III of the 1948 Agreement. See doc. 47-1 at 5. The United States seems to argue that this transfer of fee simple title to the State of Ohio included an implied restriction, that Ohio could only use the land for federal purposes. See doc. 47 at 25-26. According to the United States, because Congress appropriated funds for the purchase of lands "for 'Federal uses and purposes,'" doc. 47 at 25, when the Government transferred the land to Ohio in fee simple, it did not do so "with no strings attached." Id. These strings, the United States argues, were that the transferred land was to be used exclusively for a federal purpose. This argument lacks merit. Accepting the government's claim that the land was purchased with money that was appropriated to be used for a

19

federal purpose, the federal purpose of that appropriation was achieved when it was used to purchase that land. The government's argument would place a permanent disability on the use of any property purchased using funds appropriated by Congress. Such a disability is unsupported by any statutory authority and could easily have been achieved in the deeds conveying the land to the State of Ohio.

It is worth noting the breadth of the Government's argument that Ohio may not lease coal interests under project lands because they are inconsistent with the Corps's "federal purpose" for the project. To the extent that the United States claims that the State of Ohio has interfered with the flood control purposes of the project, it has provided no evidence on this point in support of its summary judgment motion. Thus there is no genuine issue of fact and no reasonable jury could find that the coal mining activities have actually interfered with the flood control purposes of the project. The United States further argues that Ohio may not use project lands that it owns in a way that does not frustrate a federal purpose, but that also is not directly in furtherance of a federal purpose. Had the parties to the many agreements discussed here wished to impose such a strong disability on the alienability of land held in fee simple by the state, they should have done so more clearly.

c. The United States' argument that Ohio's agreement to contribute a definite sum to the project prevents it from gaining income by leasing mineral rights in the land

Finally, the United States argues that because Ohio agreed to contribute a definite sum of money to the project, specifically for land acquisition, it cannot then use the land that it acquired to gain any new income, because to do so would somehow undercut its contribution to the project. ". . . Ohio's efforts to profit from Project lands cannot be reconciled with the purposeful cost-sharing arrangement mandated by Congress for this flood control project. Ohio has effectively converted federal funds appropriated for a cooperative flood control project and is attempting to use the land

acquired by those funds for its own economic benefit." Doc. 47 at 28.  The United States' argument that Ohio has converted federal funds is baffling.  The project required Ohio to contribute money, for a specific purpose, which it did.  It also provided Ohio with lands, which it retains in fee simple.  The requirement in the Agreement that Ohio spend money for a specific purpose was entirely satisfied *when Ohio spent money for that purpose*.  That it did so pursuant to a cooperative project does not somehow give the expenditure the power to limit the use of land in any way that produces income that the United States argues counts against that (decades old) expenditure.

**IV. Defendants' Summary Judgment Motions**

The analysis of the United States' summary judgment arguments also resolves the defendants' summary judgment motions.  As discussed above, the United States has not presented evidence from which it could be reasonably concluded that the State of Ohio breached any contractual or statutory obligation to the United States.  The State of Ohio is entitled to summary judgment on the plaintiff's declaratory judgment "breach of legal obligations" claims.  Because the mineral leases sought and obtained by Buckingham did not interfere with any contract between the United States and the State of Ohio, Buckingham is entitled to summary judgment on the plaintiff's intentional interference with contract claim.

**V. Conclusion**

For the foregoing reasons, the United States motion for summary judgement (doc. 47) is DENIED.  The motions for summary judgment filed by the State of Ohio (doc. 77) and Buckingham (doc. 73) are GRANTED.  Dismissal of the United States' claims against Buckingham also mandates dismissal of Buckingham's counterclaim.  That counterclaim in recoupment sought only to diminish

any recovery by the United States.  Without any such recovery by the United States, there can be no counterclaim in recoupment.  See doc. 69 at 12-13.

Also before the Court is a motion for leave to file amicus curiae brief by the Ohio Coal Association.  (Doc. 79).  Because the Court does not find the contextual information provided in the proposed brief to be substantially helpful in resolving the legal issues relevant to the parties' summary judgment motions, that motion is DENIED.

Finally, before the Court is a motion for sanctions pursuant to Federal Rule of Civil Procedure 11 filed by Buckingham.  (Doc. 80).  Buckingham describes this lawsuit as "a case in search of a foundation."  Doc. 85 at 1.  Indeed, some of the arguments put forth by the United States are clearly lacking in merit.  Other arguments, though not entirely baseless, are not clearly supported or explained.  Nonetheless, the Court finds that the plaintiff's claims were not frivolous or entirely unsupported by fact or law.  The motion for sanctions (doc. 80) is DENIED.

IT IS SO ORDERED.


S/ James L  Graham
James L. Graham
UNITED STATES DISTRICT JUDGE


Date: September 19, 2013